Roland Christensen
California Bar No. 326638
Alec Paradowski
California Bar No. 348802
**ARNOLD & ITKIN, LLP**
6009 Memorial Drive
Houston, TX  77007
Tel.  713-222-3800
Fax.  713-222-3850
**Attorneys for Petitioners / Plaintiffs**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| Neftaly Torres, Jr., individually, and as personal representative of the Estate of Neftaly Torres, Sr., and Aliah Torres, <br><br> *Petitioners / Plaintiffs*, <br><br> v. <br><br> Airbnb, Inc., <br><br> *Respondent / Defendant*. | Case No. 25-1378 <br><br> **VERIFIED PETITION TO VACATE ARBITRATION ORDER** |

Petitioners Neftaly Torres, Jr., individually and as personal representative of the Estate of Neftaly Torres, Sr., and Aliah Torres submit this verified petition and hereby ask the Court to vacate Arbitrator Michael F. Saydah's Order to Grant Respondent Dispositive (Rule 33) Motion. This petition is filed under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* which "allows a federal court to correct a technical error, to strike all or a portion of an award pertaining to an issue not at all subject to arbitration, and to vacate an award that evidences affirmative misconduct in the arbitral process or the final result or that is completely irrational or exhibits a manifest disregard for the law." *Kyocera Corp. v. Prudential-Bache Trade Services, Inc.*, 341 F.3d 987, 997-98 (9th Cir.

2003). For the reasons outlined below, this Court should grant the petition, vacate the arbitration order, and remand the case for further proceedings.

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

ii

**Verified Petition to Vacate Arbitration Order**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................... iii

TABLE OF AUTHORITIES ........................................................................................ iv

JURISDICTION AND VENUE .................................................................................... 1

PARTIES TO THE ARBITRATION ........................................................................... 1

RELEVANT PROCEDURAL HISTORY .................................................................... 1

REASONS TO VACATE ARBITRATION ORDER ................................................... 2

RELEVANT FACTS ..................................................................................................... 9

    I.     The Incident................................................................................................. 9

    II.    The Release ................................................................................................ 11

    III.   The Process ................................................................................................ 13

    IV.   The Profits .................................................................................................. 16

    V.    Gross Negligence ...................................................................................... 17

LEGAL STANDARD ................................................................................................... 21

THE ORDER SHOULD BE OVERTURNED ............................................................ 22

    I.     The Release is not valid or enforceable. .................................................. 22

    II.    The arbitrator erred when he found that the Assumption of Risk Doctrine barred Petitioners' negligence claims.................................................. 27

    III.   As a travel seller, Airbnb owed Neftaly a duty of reasonable care. ........ 28

        A.    Airbnb created the dangerous condition....................................... 29

        B.    Airbnb had a legal relationship with both Neftaly and Dyon. ... 30

    IV.   Airbnb failed to enforce its policies against Dyon, Airbnb's agent. ....... 32

CONCLUSION ............................................................................................................. 34

CERTIFICATE OF SERVICE...................................................**Error! Bookmark not defined.**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

iii

Verified Petition to Vacate Arbitration Order

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 22

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .................................................................................................. 2

*Bax v. Doctors Med. Ctr. of Modesto, Inc.*,
393 F. Supp. 3d 1000 (E.D. Cal. 2019) .................................................................. 22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................ 22

*Borello & Sons, Inc. v. Dep't of Indus. Relations (Borello)*,
48 Cal.3d 341, 256 Cal.Rptr. 543, 769 P.2d 399 (1989) ....................................... 31

*Brown v. USA Taekwondo*,
11 Cal.5th 204, 483 P.3d 159 (2021) ..................................................................... 29

*City of Santa Barbara v. Superior Court*,
41 Cal.4th 747, 161 P.3d 1095 (2007) ................................................................... 23

*Comedy Club, Inc. v. Improv W. Assocs.*,
553 F.3d 1277 (9th Cir. 2009) ................................................................................ 21

*Davis v. Nat'l Interstate Ins. Co.*,
686 F. Supp. 3d 984 (E.D. Cal. 2023) .................................................................... 22

*Delfino v. Agilent Techs., Inc.*,
145 Cal.App.4th 790, 52 Cal.Rptr.3d 376 (Ct. App. 2006) ................................... 32

*Doe v. Uber Techs., Inc.*,
No. 19-CV-03310-JSC, 2022 WL 4281363 (N.D. Cal. Sept. 15, 2022) ............... 30

*Epochal Enterprises, Inc. v. LF Encinitas Properties, LLC*,
99 Cal.App.5th 44, 317 Ca.Rptr.3d 573 (2024), as modified on denial of reh'g (Jan. 31, 2024) ........................................................................................................................ 23

*Eriksson v. Nunnink*,
233 Cal.App.4th 708, 183 Cal.Rptr.3d 234 (2015) ................................................ 22

*F.D.I.C. v. Cashman*,
No. C 11-03334 SI, 2011 WL 6002611 (N.D. Cal. Nov. 30, 2011) ...................... 32

*Ferrell v. S. Nevada Off-Rd. Enthusiasts, Ltd.*,
147 Cal.App.3d 309, 195 Cal.Rptr. 90 (Ct. App. 1983) ........................................ 23

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

*Jimenez v. 24 Hour Fitness USA, Inc.*,
    237 Cal.App.4th 546, 188 Cal.Rptr.3d 228, (2015) .............................................................. 23

*Kyocera Corp. v. Prudential-Bache Trade Services, Inc.*,
    341 F.3d 987 (9th Cir. 2003) ....................................................................................... ii, 21

*Liapes v. Facebook, Inc.*,
    (2023) Cal.App.5th 910 [313 Cal.Rptr.3d 330], *review denied* (Jan. 10, 2024) ......... 7, 8, 32

*Lindsey v. Travelers Commercial Ins. Co.*,
    636 F. Supp. 3d 1181 (E.D. Cal. 2022), aff'd No. 22-16795, 2023 WL 8613598 (9th Cir. Dec. 13, 2023) ............................................................................................................... 2

*Melton v. Boustred*,
    183 Cal.App.4th 521, 107 Cal.Rptr.3d 481 (2010) ................................................................ 29

*Mike Rose's Auto Body, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*,
    389 F. Supp. 3d 687 (N.D. Cal. 2019) ................................................................................. 21

*O'Connor v. Uber Techs., Inc.*,
    82 F. Supp. 3d 1133 (N.D. Cal. 2015) ................................................................................. 31

*Ochoa v. City of Hayward*,
    No. C-14-02385 DMR, 2014 WL 4088203 (N.D. Cal. Aug. 19, 2014)................................ 32

*Persian Gulf Inc. v. BP W. Coast Products LLC*,
    632 F. Supp. 3d 1108 (S.D. Cal. 2022), appeal dismissed sub nom. *Persian Gulf, Inc. v. Chevron U.S.A. Inc.*, No. 22-56010, 2023 WL 566364 (9th Cir. Jan. 11, 2023) ................ 27

*Phillips v. TLC Plumbing, Inc.*,
    172 Cal.App.4th 1133 (2009)................................................................................................ 32

*Taylor v. United States*,
    350 Fed. Appx. 129 (9th Cir. 2009) .................................................................................... 27

*U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*,
    591 F.3d 1167 (9th Cir. 2010)................................................................................................ 21

**STATUTES**

47 U.S.C. 230(c)(1) .................................................................................................................. 7

9 U.S.C. § 10(a)(3) ................................................................................................................. 21

9 U.S.C. § 10(a)(4) ................................................................................................................. 21

**RULES**

FED. R. CIV. P. 12(b)(6) ........................................................................................................... 22

FED. R. CIV. P. 56(a)............................................................................................................... 22

v

**Verified Petition to Vacate Arbitration Order**

## JURISDICTION AND VENUE

1.      Jurisdiction and venue are proper in this Court under Title 9, section 10, subdivision (a) of the United States Code. The case was previously pending in this Court before the honorable Judge Araceli Martinez-Olguin, United States District Court Judge, Case No. 3:22-cv-04087, before the parties entered a stipulation to submit Petitioners' claims to arbitration. Further, the arbitration agreement provides that"[j]udicial proceedings . . . that are excluded from the arbitration agreement . . . must be brought in state or federal court in San Francisco, California[.]"

## PARTIES TO THE ARBITRATION

2.      Petitioner Neftaly Torres, Sr., deceased, was a resident of Texas at the time of the underlying incident and his death.

3.      Petitioner Neftaly Torres, Jr., is the adult son of Neftaly Torres, Sr. and resides in Harris County, Texas, 14411 Chartley Falls, Houston, Texas 77044.

4.      Petitioner Aliah Torres is the adult daughter of Neftaly Torres, Sr. and resides in Harris County, Texas at 14411 Chartley Falls Drive, Houston, Texas 77044.

5.      Defendant Airbnb, Inc. is a California corporation and maintains its principal business office in California in San Francisco County. Defendant Airbnb, Inc. may be served with process through its agent Corporation Service Company d/b/a CSC—Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, California 95833.

## RELEVANT PROCEDURAL HISTORY

6.      Petitioners sued Airbnb, Inc. in the Superior Court of the State of California for the County of San Francisco, case number CGC-22-600622. Airbnb removed the case to this Court on July 12, 2022, case number 3:22-cv-04087, the Honorable Judge Araceli Martinez-Olguin, presiding.

7.      On July 13, 2022, the case was assigned to Magistrate Judge Thomas S. Hixson.

Verified Petition to Vacate Arbitration Order

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

8.    On August 11, 2022, Petitioners moved to remand.

9.    On August 19, 2022, the case was reassigned to Judge Jon S. Tigar. Judge Tigar denied Petitioners' motion to remand on March 13, 2023.

10.    On May 10, 2023, the case was reassigned to Judge Martinez-Olguin.

11.    On May 31, 2023, Judge Martinez-Olguin granted the parties' stipulation to submit the claims to arbitration and stay all district court proceedings.

12.    In August 2023, Petitioners (as Claimants) filed a demand for damages with the American Arbitration Association, case number 01-23-0003-6203. The claims were assigned to arbitrator Michael F. Saydah, Esq. Petitioners filed a first amended demand for damages on February 1, 2024.

13.    On June 14, 2024, Airbnb filed a motion for summary disposition. Petitioners filed a response, and the arbitrator heard oral argument on October 28, 2024.

14.    The arbitrator issued his order granting Airbnb's dispositive Rule 33 motion on November 9, 2024.

### REASONS TO VACATE ARBITRATION ORDER

15.    The Federal Arbitration Act allows for "efficient, streamlined procedures tailored to the type of dispute." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 334 (2011). Arbitration offers the litigants a speedy, fair resolution in line with the terms of the agreement. But the benefits to arbitration are frustrated if an arbitrator's manifest errors deprive the litigants of "the minimal requirements of fairness—adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator[.]" *Lindsey v. Travelers Commercial Ins. Co.*, 636 F. Supp. 3d 1181, 1184 (E.D. Cal. 2022), aff'd No. 22-16795, 2023 WL 8613598 (9th Cir. Dec. 13, 2023). Based on the order granting Airbnb's Rule 33 dispositive motion, the arbitrator made manifest errors of law, did not consider certain evidence, and otherwise failed to apply appropriate summary judgment standards that require

the factfinder—in this case the arbitrator—to draw all reasonable inferences supported by the evidence in favor of the non-moving party. If the arbitrator had done so, he would have found that genuine issues of fact firmly fell in Petitioners' favor such that Petitioners were entitled to a full hearing on the merits where they could offer additional testimony, evidence, and expert opinions in support of their claims.

16.     Petitioners Neftaly Jr., and Aliah Torres filed this case following the death of their father, Neftaly Torres, Sr., who tragically drowned while cliff diving during an Airbnb excursion. Airbnb intentionally ignored its own policies and failed to protect Mr. Torres. Petitioners allege that Airbnb was negligent and grossly negligent and sought a hearing by an arbitrator. After briefing on Airbnb's Rule 33 motion, the arbitrator issued an order granting the motion and dismissing Petitioners' claims. The arbitrator's decision was error for several reasons.

17.     Airbnb, Inc., operates an online marketplace for short-and-long-term homestays and experiences. The experiences are offered by local hosts who submit proposed listings. Airbnb reviews those listings—for all of 10 minutes—before posting them to its platform.

18.     Neftaly Torres, Sr., and his girlfriend, Thu-Van Tseng, used the Airbnb app and booked an Airbnb experience that was advertised to them while renting an Airbnb in Aruba. The Experience host, Dyon, promised an intimate nature hike and swimming experience in Arikok National Park. Unbeknownst to Neftaly and Van, Dyon also planned to have the couple cliff jump—a prohibited activity classified by Airbnb as "death-defying." Dyon took the couple swimming and then to the cliff where Dyon and Neftaly jumped into the bay. The intensity of the waves and the undertow made it impossible for Neftaly to make it back to shore and, tragically, he drowned.

19.     Airbnb's business records show that Airbnb had *actual knowledge* that Dyon was taking guests cliff diving in direct violation of Airbnb's policies. At least seven reviews for Dyon's host experience in the few months before the incident directly discussed cliff diving or cliff jumping.

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

Sadly, Airbnb took no action. To compound matters, Airbnb failed at the outset to properly vet The Experience. Airbnb's operations specialist in India who reviewed the listing did not conduct even a simple search that would have found that even swimming is not allowed in Arikok National Park. In short, the evidence shows that Airbnb failed on multiple levels despite having the duty, the means, the technology, and the opportunity to act.

20.    In the Order, the arbitrator made the following findings:

- I find the Claimant's Demand for Arbitration and the Amended Demand for Arbitration state sufficient facts to constitute a cause of action.

- I find, based on the law in California and the facts of this case Decedent had ample opportunity to review the Terms of Service. Nor is there any gross negligence by any failure to warn to defeat the Express Assumption of the Risk agreement. Decedent and Decedent's heirs, Claimants herein, are bound by the Terms of Service and the Express Assumption of the Risk which is a bar to this matter.

- I find Respondent did not owe any further duty to vet the Host Dyon any further than described in the deposition testimony. There is no evidence Respondent was even aware of the customer reviews of this Host. Section 230 of the Communications Decency Act (47 U.S.C. 230) does protect Respondent from liability for the failure to monitor third-party content. The primary assumption of the risk doctrine applies in this case and does act as a bar to any duty on the part of Airbnb.

- I find the sole or legally superseding cause of this incident was decedent's own conduct of cliff jumping.

21.    But the arbitrator erred in at least four ways.

22.    *First*, the arbitrator erred by ignoring, or otherwise failing to give proper weight to key facts. In their response, Petitioners showed that:

- There was no evidence that Neftaly (or any of the Claimants or witnesses) saw, read, or agreed to the terms of service.

- Even still, in California, a release cannot be used to sign away liability for gross negligence—of which there is overwhelming evidence here.

- Airbnb's assumption of the risk defense fails because Airbnb (and Dyon, its agent) ensured Neftaly he would be safe, but failed to warn Neftaly that cliff jumping was classified by Airbnb as a death-defying activity and strictly

4

prohibited for host experiences.

- Airbnb failed to properly vet the experience and consciously chose not to conduct any follow-up to the listing approval. If it had, it would have seen that Dyon was taking guests on experiences that involved forbidden activities.

- Finally, Airbnb owed Neftaly a duty and was responsible for his safety. At the least, Airbnb should have warned Neftaly about the dangerous activity and provided Neftaly with all the information a non-local tourist should be given.

23. In the order, the arbitrator states that "[Airbnb] properly vetted the Experience Host Dyon, and Dyon's advertisement on the Airbnb website does not disclose any prohibited activities." Yet, the arbitrator:

- Ignored or did not properly consider evidence that Dyon's proposed Experience had been approved even though one of the suggested activities for the Boca Keto hike was swimming in the Arikok National Park—a prohibited activity. With very little research, Airbnb could have (and should have) ascertained that Dyon's proposed Experience violated Airbnb policy.

- Ignored or did not properly consider evidence that Airbnb makes the strategic choice to minimize its involvement in and vetting of Host listings. Expert testimony showed that Airbnb purposely operates its arm's-length platform to minimize regulatory risk.

- Ignored or did not properly consider all evidence Petitioners provided from Airbnb's 2022 Annual Report that showed Airbnb chose to limit its involvement in Host listings to "undercut various defenses" and avoid "additional liability."

24. The arbitrator states that "everyone looked over the top to the water below" and "appreciated the risk." Later, he states that "Decedent clearly understood and appreciated the risks of the jump[.]" Yet he ignored in his analysis evidence that:

- Dyon told Neftaly that he had taken groups cliff jumping in this same spot at least 13-15 times and that it was safe.

- Dyon told Neftaly (during the first stop at the cliff) that the tide would subside to safe levels.

- Dyon told Neftaly that he was very familiar with the current and the ocean in that area.

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

5

**Verified Petition to Vacate Arbitration Order**

- Dyon repeatedly encouraged Neftaly to jump.

- Dyon showed Neftaly where and how to jump and instructed him on aim path and where to swim to make it back to shore.

- Neftaly had never cliff jumped before.

- Neftaly would not have jumped if he thought it was unsafe or unreasonably dangerous.

25. The arbitrator also states that there is no evidence that Airbnb was aware of the customer reviews and that regardless, Section 230 protects Airbnb. Yet he ignored evidence in his analysis that:

- Airbnb can and does monitor communications on its app to identify risks to its users and to enforce its terms of service and nondiscrimination policy. One way it does this is by scanning for keyword terms. And Airbnb implements AI technology during the vetting process. It could use these same technologies to monitor reviews for potential policy violations.

- Airbnb's corporate representative testified that the reviews are company documents—knowledge of the documents is imputed to the company.

26. Failing to consider these facts, or give them proper weight, was error, therefore, the arbitrators' order should be vacated.

27. *Second*, the arbitrator erred by not resolving issues of fact in Petitioners' favor. Several times in the order, the arbitrator made inferences from the evidence in favor of Airbnb. For example, from the facts, the arbitrator inferred that:

- Airbnb's mobile sign-up screen adequately placed Neftaly on notice of Airbnb's Terms of Service.

- Decedent clearly would have seen the relevant text from a quick glance down the rest of the Terms of Service page.

- Decedent manifested his assent to the Terms of Service.

- Decedent was on notice he was entering a contract with Airbnb and agreeing to the terms of service including the paragraph on Responsibility and assumption of the risk.

6

**Verified Petition to Vacate Arbitration Order**

- Airbnb properly vetted the Experience Host Dyon.

- Neftaly appreciated the dangers of cliff jumping when he reached the cliff area the first time during the hike and when the group arrived the second time when he and Dyon jumped.

- Airbnb was unaware of the customer reviews of Dyon and the Experience that specifically mentioned cliff jumping.

28. Facts going to these issues should have been resolved in Petitioners' favor. The arbitrator erred in this regard and the order should be vacated.

29. *Third*, the arbitrator incorrectly concluded that Section 230 of the Communications Decency Act (47 U.S.C. 230(c)(1)) precluded liability on the part of Airbnb for its failure to monitor The Experience, host Dyon, and the customer comments.

30. Generally, "Section 230 'immunizes providers of interactive computer services against liability arising from content created by third parties.'" *Liapes v. Facebook, Inc.*, (2023) Cal.App.5th 910, 928 [313 Cal.Rptr.3d 330, 345], *review denied* (Jan. 10, 2024). The Act's provisions "convey 'an intent to shield Internet intermediaries from the burdens associated with defending against state law claims that treat them as the publisher or speaker of third party content.'" *Id.* But "[t]he prototypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *Id.* (internal quotations omitted).

31. And as one court in California has explained, "an interactive computer service provider only has immunity if it is *not* also the information content provider—that is, someone 'responsible, in whole or in part, for the creation or development' of the content at issue." *Id.* (emphasis as in original). In short, "[p]assively displaying content 'created entirely by third parties' renders the operator only a service provider 'with respect to that content.'" *Id.* But, as is the case here, when the provider creates the content, "or is responsible, in whole or in part for creating or developing, the website is also a content provider." *Id.* (internal quotations omitted). "Thus, a

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

7

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

website may be immune from liability for some of the content it displays to the public but be subject to liability for other content." *Id.* (internal quotations omitted).

32.    In this case, the arbitrator erred when it declared Airbnb could not be held liable where the evidence showed that:

- Airbnb purposely constructed its platform to gain the trust of its users and to encourage them to buy Experiences.

- Airbnb has carefully engineered its platform and the user experience to garner the trust of its users and to encourage them to purchase experiences like the one at issue here.

- Neftaly booked the Experience through the Airbnb app after receiving an advertisement while booking the house rental.

- Airbnb has certain standards and guidelines for host experiences. Airbnb employees vet the proposed experiences to ensure that the proposed activities comply with Airbnb standards and policies.

- Cliff jumping is a prohibited activity per Airbnb's policies.

- The listing for The Hike referenced swimming in Arikok National Park—a prohibited activity.

- Users can post reviews of for the Airbnb Host Experiences. This allows users to make informed decisions about the Experiences—that again are vetted, accepted, advertised, and linked to Airbnb.

- Airbnb policy allows Airbnb to undertake an enforcement action if a Host is engaging in prohibited activities. Airbnb will review reported violations.

- The record shows that there were at least seven reviews of this particular Experience in the three months before Neftaly's death alerting Airbnb to prohibited activities.

33.    As noted above, Airbnb cannot avoid liability under the Act because it is in whole or in part responsible for the content on its platform. Airbnb is not a messaging board or online-community platform that would fall under Section 230 immunity. Instead, Airbnb offers services, produces content, and elicits information from its users all in an effort to target the users and sell its services that include the Experiences. Airbnb is responsible for the content on its platform, including

**Verified Petition to Vacate Arbitration Order**

the customer reviews. Those customer reviews gave Airbnb (at the least) constructive knowledge that Dyon was violating Airbnb policy and putting Airbnb users in harm's way. The arbitrator erred when he decided that Airbnb is not liable for the content on its platform.

34.    Based on the law and the evidence—where all inferences that should have been taken in Petitioners' favor—there are issues of fact that precluded a dispositive ruling at the motion to dismiss/summary judgment phase. The Court should vacate the order.

## RELEVANT FACTS[1,2]

### I.    The Incident

35.    Neftaly Torres, Sr., by all accounts was an active, healthy man who loved to travel, loved to spend time with his family and loved ones, and loved the water. Ex. 1: Tseng Dep., at 8:16; Ex. 3: Aliah Torres Dep., at 10:12-23; Ex. 2: Neftaly Torres, Jr., Dep., at 14:18-24. He and his girlfriend, Thu-Van Tseng, liked to vacation at beach locations like Isla Mujeres Mexico, Cozumel, and Grand Cayman Islands. Ex. 1: Tseng Dep., at 7:11-13; id. at 9:13-25. In July 2021, the two took a trip to Aruba. Id. at 10:3-5. Neftaly did most of the planning. Id. at 11:10-11. When they got there, Neftaly and Van hit several vacation spots and eventually booked a house on the Airbnb app. Id. at 15:24-16:18.

36.    During the rental process, Neftaly received an advertisement from Airbnb about a one-on-one hiking experience on the island. Id. He liked the "personal touch" that the host exhibited and booked the experience. Ex. 1: Tseng Dep., at 16:19-17:21. The listing promised a nature hike in Arikok National Park with a local guide, Dyon, that included swimming in a natural pool near the ocean. Id.

---

[1] Exhibit citations coincide with the exhibits to Petitioners' (Claimants') response to Airbnb's Rule 33 motion. The response and exhibits can be found in Appendix Tab 4.

[2] Petitioners incorporate by reference the facts and allegations made above.

9

**Verified Petition to Vacate Arbitration Order**

37. On the morning of the incident, Neftaly and Van met Dyon at a convenience store parking lot at 7:30 a.m. Ex. 1: Tseng Dep., at 22:2-4. There, for the first time, Dyon mentioned that the experience would include cliff diving. Id. at 30:19-25; id. at 61:20-22. Dyon told them both that he had taken groups cliff jumping 13-15 times and that it was safe. Id. at 62:3-14. In her deposition, Van explained that at this point she had no idea how high the cliff was; she thought it was "something like a diving board or something." Id. at 31:1-3. All three planned to jump off the cliff. Id. at 31:12-13.

38. After meeting up, the group (that included an acquaintance or relative that knew Dyon), drove their separate cars to the location. Ex. 1: Tseng Dep., at 21:7-11; 21:18-21. They stopped at a parking area, parked, and set off on foot. Id. at 23:5-8.

39. The hike to the cliff area took about 25 minutes. Ex. 1: Tseng Dep., at 26:6-13. When they got there, Dyon mentioned that the tide seemed high. Id. at 28:4-10. Dyon assured Neftaly and Van that the tide would likely die down later in the day, so the group headed to the natural pool and come back later. Id. For her part, Van described the ocean that day as "choppy" with "a lot of waves." Id. at 30:8-9. Dyon reassured the couple that he was "very familiar with the current in the ocean." Id. at 30:14-19.

40. After spending time at the natural pool, the group returned to the cliff area around 11:00 o'clock in the morning. Ex. 1: Tseng Dep., at 37:15-24. No one else was around. Id. at 39:8-10. According to Dyon the conditions had improved enough that it was safe to jump. Id. at 39:11-24. Van watched, and Dyon encouraged Neftaly to jump. Id. at 40:1-41:7; 41:12-13. Thu-Van watched as Dyon and Neftaly headed to the cliff. Id. Van saw Dyon show Neftaly how to jump and instruct him where to aim and the path to swim back to shore. Id. Van asked Dyon multiple times if it was safe. Id. Dyon repeatedly reassured her that it was. Id.; id. at 41:14-24.

41. According to his son, Neftaly had never cliff jumped before. Ex. 2: Neftaly Jr. Dep.,

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

at 21:21-23. But by all accounts, Neftaly was a good swimmer. Ex. 1: Tseng Dep., at 44:8-10. Those who knew him best, said that Neftaly would not have jumped if he thought it wasn't safe. Ex. 2: Neftaly Jr., Dep., at 22:24-23:1. Both Dyon and Neftaly jumped but only Dyon was able to swim back to shore. Ex. 1: Tseng Dep., at 45:23-47:11. Van videoed the entire incident (a copy has been provided to the arbitrator as Exhibit 10). As shown in the video, Neftaly drowned after jumping off the cliff with Dyon.

**II.    The Release**

42.    "[T]ravel sellers have a duty to disclose and warn out-of-town customers of relevant information and any risk of foreseeable dangers and harm associated with a particular destination, which the travel seller knew or should have known about." Ex. A to Exhibit 6: Price Report, at 20. "This duty to disclose has been the industry standard for years[.]" *Id.*

43.    Airbnb purposely constructed its platform to gain the trust of its users and to encourage them to buy Experiences. Ex. A to Exhibit 7: Hochman Report, at 13. In a survey conducted by Copenhagen Business School, nearly three-fourths of Airbnb users agreed that "Airbnb is a trustworthy platform" meaning that "guest" respondents on average "have a tendency to trust that Airbnb is honest, reliable and credible; have good intentions and high ethical standards; is competent; have a highly functioning website with up-to-date information; an ability to protect personal information; offers support when needed; oppose inappropriate behavior; and have an ability to screen community members and carry out thorough background checks." *Id.* at 13-14.

44.    "Academic research has found that users' trust in a platform transfers to counterparties introduced through the platform." *Id.* at 15. Airbnb has "carefully engineered the user experience to produce this trust" to the benefit of both Airbnb and the Experience hosts. *Id.* at 16. For example, "Airbnb branding and logos are front and center to the user at every stage of the customer journey, from browsing Experiences, purchasing an Experience, through the confirmation

email, to the invoice, payment, and even the customer's credit card statement." *Id.* All to present "a clear impression to the customer that they are purchasing the Experience from Airbnb." *Id.*

45.    "Formal terms, conditions, responsibility statements and disclaimers are a common and crucial part of the travel industry, used to protect the travel seller and the client." Ex. A to Exhibit 6: Price Report, at 21. Industry standards dictate that "it is more efficient and ideal to introduce disclosures, terms and conditions at the beginning of the booking process." *Id.* Disclosure should include written terms, a hardcopy of the confirmation and acceptance, and documentation showing the date and time of the communication to the customer. *Id.*

46.    In this case, Neftaly made the Experience reservation on his cell phone—as is common for Airbnb users. *Id.* at 22. Ms. Chauvet, corporate representative for Airbnb, testified that once a user reaches the "confirm and pay" button, Airbnb's policies are linked for review. Ex. :4 Chauvet Dep., at 49:21-50:1; *id.* at 50:17-24. Nothing in the app forces a user to read the policies. *Id.* During her deposition, Ms. Chauvet was asked to produce evidence that Neftaly reviewed the policies. She could provide no company document or business record that showed that Neftaly ever saw, read, or agreed to the policies. *Id.* And there is no evidence that either claimant read the terms of service. Ex. 4: Chauvet Dep., at 53:23-54:8; Ex. A to Exhibit 6: Price Report, at 54 ("Prior to selling 'The Experience,' there is no evidence that Airbnb obtained written consent from Neftaly, Sr., to acknowledge that he was aware that cliff jumping was part of 'The Experience,' and that it was prohibited on the Airbnb platform and also prohibited in Arikok National Park.").

47.    But even if it can be said that Neftaly signed and agreed to the policies and terms of service (which there is zero evidence of) the release is still inadequate. Ex. A to Exhibit 6: Price Report, at 71 ("posting terms and conditions on Airbnb's website is not enough").

48.    "The Airbnb legal terms currently consist of 13 categories of 80 documents" Ex. A to Exhibit 7: Hochman Report, at 18. When he booked the Experience, Neftaly would have found

12

**Verified Petition to Vacate Arbitration Order**

that the four documents most relevant to the experience consisted of over 48,000 words of text: Terms of Service (~19,000 words), Privacy Policy (~6,000 words), Payments Terms of Service (~23,000 words), and Guest Release Waiver (~1,000 words). *Id.* Reading these documents "would take an average adult 3 hours and 21 minutes, assuming no breaks, distractions, or fatigue." *Id.*

49.    The Airbnb Terms of Service and Privacy pages "are linked at the very bottom of Airbnb website pages in small text." *Id.* "Consumers are very unlikely to read these pages." *Id.* at 18-19. "The Guest Release Waiver is presented as a link during the checkout process, when a customer is attempting to complete a transaction and is very likely to skip over the link rather than be sidetracked." *Id.* at 19. If a user does not click on the waiver, they won't see it. *Id.* Airbnb should have presented "the waiver terms in their entirety" and required the customer "to check a box affirming that they have read and understood the terms before completing their purchase." *Id.* Other tour operators follow this practice, but not Airbnb. *Id.*

50.    To complicate matters even more, "Airbnb terms of service are written in complex and hard-to-read language." *Id.* at 20. Good website practice aims at an 8th-grade reading level for content. "None of the Airbnb pages" discussed above "is anywhere close to 8th grade reading level" and all are "much too long for easy online consumption." *Id.*

51.    In short, "Airbnb's user terms and conditions do not clearly, explicitly and comprehensibly convey to an ordinary user that the user is waiving all liability, even for injuries caused by Airbnb's failure to follow its own policies." Ex. A to Exhibit 6: Price Report, at 70.

**III.    The Process**

52.    Airbnb began offering "Experiences" in November 2016. Ex. A to Exhibit 7: Hochman Report, at 8. An initial launch of 500 experiences in 12 cities quickly grew just one year later to over 3100 offerings in 26 countries and over 40 cities. *Id.*

53.    Under Airbnb's Experiences outdoor activities policy, Airbnb partnered with the

Verified Petition to Vacate Arbitration Order

Adventure Travel Trade Association "to determine which types of outdoor activities" should be allowed on Airbnb. Ex. A to Exhibit 7: Hochman Report, at 10. Together, ATTA and Airbnb determined that cliff jumping should not be allowed. *Id.*

54.    Neftaly booked the hike through the app after receiving an advertisement while booking the rental. Ex. 1: Tseng Dep., at 58:11-59:16. Van explained that by booking the experience through the Airbnb app, she and Neftaly trusted that Airbnb would do their due diligence before offering the service. *Id.*

55.    Airbnb has certain standards and guidelines for host experiences. Ex. 5: Panda Dep., at 13:20-23. Each proposed listing is submitted to Airbnb with a text description written by the host that must be approved by an Airbnb specialist. Ex. 5: Panda Dep., at 28:22-29:3. Airbnb specialists are required to review 50-55 listings per eight-hour shift. Ex. 5: Panda Dep., at 35:9-12; 37:22-25; 40:7-14; 40:20-41:2. Thus, on average, each experience is vetted for about 10 minutes. *Id.* at 38:6-17.

56.    Some of the proposed host experience listings include photographs. Ex. 5: Panda Dep., at 25:10-12. The specialist who vets the experience only reviews the test—he or she does not look at the photographs. *Id.* at 33:17-20. And even if they wanted to, they could not because Airbnb does not give the specialist access to the full-size photos. *Id.* at 132:6-20.

57.    The only objective of the specialist's job is to ensure that no experience is submitted to go live on the Airbnb app that violates Airbnb's policies. Ex. 5: Panda Dep., at 46:6-10. The specialists are trained to look at the listing and spot potential policy violations. *Id.* at 46:24-47:1. According to Mr. Panda, "My job is to, like, do my -- do the vetting on a listing, and if I see a death-defying activity, my job is to decline the listing." *Id.* at 80:24-81:1.

58.    Sometimes it is obvious from the text that there are policy violations. Ex. 5: Panda Dep., at 49:2-11. If the text of the listing indicates that the experience includes a prohibited activity,

14

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

the specialists decline the listing automatically. *Id.* at 53:6-17. Other times, it may not be readily apparent that the listing violates Airbnb policy. But Airbnb does not train its employees to go beyond the text, even if the pictures submitted by the host indicate that the experience includes prohibited activities. *Id.* at 92:10-19. And Airbnb does not train its specialists to conduct any targeted research about the experience's geographic location to ensure that the area is safe. *Id.* at 87:1-12.

59.    Airbnb specialist, Mr. Panda (the specialist who approved the experience) admits that cliff diving or jumping can be very dangerous. Ex. 5: Panda Dep., at 86:2-4. If the proposed host experience includes prohibited activities like cliff jumping, Airbnb must decline the experience. *Id.* at 23:23-24:2. Cliff jumping is declined automatically. *Id.* at 24:15-21. Text in a proposed listing that suggests that cliff jumping will occur at *any* height gets the automatic decline. *Id.* at 95:6-23. Mr. Panda claimed that he has never approved an experience that included cliff jumping. *Id.* at 24:8-10.

60.    As occurred here, if an experience makes it on the website, that means it has been vetted and approved by Airbnb. Ex. 5: Panda Dep., at 99:17-21. The text listing that Airbnb approved for Dyon's Aruba experience suggested that the activities included a hike to a place called Boca Keto. *Id.* at 100:10-18. The cliff was in Arikok National Park. *Id.* at 104:7-13. The listing references swimming in the Park. *Id.* at 108:25-109:3. Mr. Panda did not conduct any research about the area. A simple Google search would have revealed that even swimming is prohibited and against park policies. *Id.* at 109:13-110:1.

61.    But "Airbnb makes the strategic choice to minimize their own involvement in and vetting of Host listings and conduct related to bookings." Ex. A to Exhibit 7: Hochman Dep., at 23. It does this because "regulatory risk is one of the greatest threats to their business model and financial success[.]" *Id.* According to Airbnb, "operating as an arms-length platform with as little involvement as possible minimizes regulatory risk." *Id.* at 23-24. Consider these statements from

15

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

Airbnb's 2022 Annual Report:

- "In particular, if we become more involved in Hosts' listings and conduct related to bookings, then we are more likely to draw scrutiny and additional regulations from governments **and undercut various defenses we may have to claims** or attempts to regulate us, which further constrain our business **and impose additional liability on us as a platform**[.]"

- ". . . we have not in the past and may not in the future undertake to independently verify the safety, suitability, location, quality, compliance with Airbnb policies or standards and legal compliance . . . of all of our Hosts' listings or experiences."

- "In the limited circumstances where we have undertaken the verification or screening of certain aspects of Host qualifications, listings or experiences, the scope of such processes may be limited and rely on, among other things, information provided by Hosts and guests and the ability of our internal teams or third-party vendors to adequately conduct such verification or screening practices."

- "In addition, we have not in the past taken and may not in the future take steps to re-verify or re-screen Host qualifications, listings, or experiences following initial review."

- ". . . certain listings may pose heightened safety risks to individual users because those issues have not been reported to us or because our customer support team has not taken the requisite action based on our policies."

*Id.* at 24-26.

62.     In short, Airbnb intentionally and consciously throttles its involvement in certain aspects of the experiences to avoid government scrutiny, assist with litigation, and maximize profits.

**IV.     The Profits**

63.     "Airbnb takes a higher share of margin from Experiences than from Stays and can reuse existing technology, support, and customer service efforts, so Experiences are much more profitable for Airbnb." *Id.* at 50. Even still, "Airbnb reduced the money they were spending on Experiences during 2020-2021 to meet financial objectives for capital markets, likely leading to even lower standards of trust and safety practices." *Id.* at 27. In a Q2 2022 investor call, Airbnb CEO Brian Chesky discussed the "Experiences" pause and noted that it helped the company

16

**Verified Petition to Vacate Arbitration Order**

generate "nearly $3 billion in free cash flow." *Id.* at 27-28.

64. Incidentally, Airbnb stopped accepting new Experiences in April 2023. *Id.* at 9. In May 2024, Airbnb introduced "Icons"—described as "extraordinary experiences hosted by the greatest names in music, film, television, art, sports and more." *Id.* A few weeks later, Airbnb removed 5000 Experiences from the platform because they did not meet Airbnb standards. *Id.*

65. In the past, Airbnb has shown that it can act quickly to implement automated initiatives in response to negative publicity or threat of regulation all for maintaining or increasing profits. *Id.* at 45. For example, in 2017, "Airbnb intervened to stop white supremacists from using the platform to violate Airbnb's non-discrimination policies." *Id.* at 46. In a New Times article, Airbnb explained that it took "steps to cancel . . . reservations and remove . . . accounts" of members of known hate groups in the days before a white supremacist rally in Charlottesville in 2017. *Id.*

66. Later, Airbnb "applied technology to identify, modify and shut down non-compliant bookings . . . in response to growing negative publicity about Airbnb 'party houses' causing neighborhood disruption." *Id.* at 47. Airbnb used the same monitoring and tracking technology to "crack down on New Year's Eve parties" by blocking or redirecting reservation attempts to protect users. *Id.* at 47-48. These examples show that Airbnb can act to screen users, adjust bookings, cancel reservations, monitor business records, and so on when Airbnb chooses to.

## V. Gross Negligence

67. When Neftaly purchased the experience, an "agency relationship to act on [his] behalf . . . was created[.]" Ex. A to Exhibit 6: Price Report, at 25-26. "An agency relationship creates implied duties in every interaction between a travel seller and the principle." *Id.* at 26. These duties include general duties of reasonable care and due diligence to act "in accordance with client's wishes," to exercise the necessary skill to serve the client, and "to disclose all information that is relevant to the clients travel plans[.]" *Id.* In short, "Airbnb had a duty to work in Neftaly Sr.'s best

**Verified Petition to Vacate Arbitration Order**

interest and provide him with the best advice." *Id.* at 27.

68.     Neftaly and Van relied on Airbnb and Dyon to provide the experience as advertised. Ex. 1: Tseng Dep., at 39:1-3. And they relied on Dyon who insisted multiple times that it was safe for Neftaly to jump. *Id.* at 43:17-22. "Airbnb did not warn or tell Neftaly Sr., that cliff diving was a prohibited activity or how dangerous it was." Ex. A to Exhibit 6: Price Report, at 34. Van testified that if she and Neftaly had known that cliff diving was a prohibited activity, they would not have gone on The Experience. *Id.* at 60:2-21; 61:7-16.

69.     Sadly, "Airbnb had repeated data signals from the customer feedback that the Experience provider was violating terms of service in offering a forbidden service." Ex. A to Exhibit 7: Hochman Report, at 31. But Airbnb intentionally ignored the data and failed to take actions that would have saved Neftaly's life.

70.     Airbnb users like Neftaly and Van can post reviews of their experiences that can help inform others who are considering booking with individual hosts. Ex. 4: Chauvet Dep., at 28:15-18; 29:3-7. The reviews allow users to make informed decisions about the stays or the experiences. *Id.* at 42:15-23. Importantly, Airbnb can look at and monitor the reviews any time. *Id.* at 31:18-23.

71.     Airbnb's representatives admitted repeatedly that cliff jumping, or cliff diving is a prohibited activity that puts both the host and guest at risk and a direct breach of Airbnb policies. Ex. 4: Chauvet Dep., at 36:17-37:3; 37:22-25; 39:5-11; Ex. 5: Panda Dep., at 87:1-12. When shown the video of the incident, Ms. Chauvet agreed that the activity violated Airbnb's community guidelines. Ex. 4: Chauvet Dep., at 93:14-94:6.

72.     Ms. Chauvet also explained that violations of Airbnb policy by hosts can trigger an enforcement action. Ex. 4: Chauvet Dep., at 65:6-11. And violations of Airbnb's terms of service are grounds for suspension. *Id.* at 79:14-24. If a host is engaging in prohibited activities and Airbnb is notified, per Airbnb policy, Airbnb would then review the violation and determine whether to act

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

or enforce its suspension policies. _Id._ at 78:22-79:4. Here, "Dyon did not hide the fact that cliff jumping, diving and swimming was happening." Ex. A to Exhibit 6 : Price Report, at 55. Indeed, "Airbnb knew that cliff jumping was popular and included in 'The Experience[] . . . [because] Dyon received many excellent reviews from guests, highly recommending 'The Experience.'" _Id._ Despite knowing that Dyon was encouraging guests to participate in prohibited activities, Airbnb did not shut down the experience or start any other enforcement actions. _Id._

73.    Airbnb can and does monitor communications on its app to identify risks to its users and to enforce its terms of service and nondiscrimination policy. Ex. 4: Chauvet Dep., at 67:20-68:2;  69:14-70:2. One way it does this is by scanning for keyword terms. _Id._ at 71:17-72. Airbnb uses this technology for messages between its users but does not do the same to monitor other business records (like user reviews) for potential violations of its terms and policies or for prohibited activities. _Id._ Airbnb freely admits that it can run searches, scan, and analyze any of its business records. _Id._ at 72:14-17. It even has AI capabilities that flag certain words during the vetting process to make review easier for Airbnb employees. Ex. 5: Panda Dep., at 120:9-14.

74.    **In just the <u>three months</u> before the incident, <u>at least seven reviews </u>for Dyon's Aruba experience mention cliff diving or cliff jumping**—activities prohibited by Airbnb. Reviews were submitted on these dates:

- April 4, 2021 - Ex. 4: Chauvet Dep., at 75:21-76:10; Ex. A to Exhibit 6: Price Report, at 67-70; Ex. 8: Demand, at ¶ 8.

- April 30, 2021 - Ex. 4: Chauvet Dep., at 77:21-78:1; Ex. A to Exhibit 6: Price Report, at 67-70; Ex. 8: Demand, at ¶ 8.

- May 15, 2021 - Ex. 4: Chauvet Dep., at 83:3-10; Ex. A to Exhibit 6: Price Report, at 67-70; Ex. 8: Demand, at ¶ 8.

- May 31, 2021 - Ex. 4: Chauvet Dep., at 86:8-15; Ex. A to Exhibit 6: Price Report, at 67-70; Ex. 8: Demand, at ¶ 8.

- June 14, 2021 - Ex. 4: Chauvet Dep., at 80:22-81:10; Ex. A to Exhibit 6: Price Report, at 67-70; Ex. 8: Demand, at ¶ 8.

19

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

- June 24, 2021 - Ex. 4: Chauvet Dep., at 81:21-82:13; Ex. A to Exhibit 6: Price Report, at 67-70; Ex. 8: Demand, at ¶ 8.

- June 26, 2021 - Ex. 4: Chauvet Dep., at 80:3-12; Ex. A to Exhibit 6: Price Report, at 67-70; Ex. 8: Demand, at ¶ 8.

75.    Unbelievably Ms. Chauvet dismissed the reviews claiming that there is no evidence the activities were reported to Airbnb—*even though these were reviews posted directly to Airbnb*. Ex. 4: Chauvet Dep., at 88:1-20. But she admitted that the reviews are business records that Airbnb owns and can access and review anytime. *Id.*; *see also id.* at 88:22-89:16; 90:17-25. And she admitted that Airbnb could have accessed the reviews before July 8, 2021 when Neftaly died. *Id.* at 99:14-19. To be sure, "[t]here were no technical or material cost barriers to Airbnb monitoring customer feedback for violations of terms of service; the most likely explanation is that they simply choose not to." Ex. A to Exhibit 7: Hochman Report, at 32.

76.    "To show how trivially easy it would have been for Airbnb to apply text analytics to customer comments to identify and prevent the Deadly Experience," Claimants' expert Jonathan Hochman "developed a proof-of-concept computer program to demonstrate the effectiveness of text analytics (as available in 2021) in detecting improper experiences." *Id.* at 32-33. When run, the program easily flagged the reviews of Dyon's Aruba Experience showing that Dyon was having guests engage in "non-compliant activities." *Id.* at 33.

77.    When applying that program to other Airbnb Experience offerings, "the very first Experience [Hochman] checked had a comment alluding to cliff jumping." *Id.* at 34. Upon further investigation, the Experience involved the same location as the Aruba Experience where Neftaly died. *Id.* The Experience was live on Airbnb's platform as of July 2024. *Id.* The program was also so effective at finding violations, that it produced no false positives. *Id.*

78.    Additional searches "found six more Experiences" that "incorporated cliff diving that were still live on the Airbnb site." *Id.* at 35.

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

**LEGAL STANDARD**

**I.    Review of arbitration award.**

79.    "The Federal Arbitration Act ("FAA") governs the role of federal courts in reviewing arbitration decisions." *Mike Rose's Auto Body, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 389 F. Supp. 3d 687, 694 (N.D. Cal. 2019). Sections 10 and 11 of the Act prescribe the circumstances under which a court can review an arbitration order. *Id.* "Judicial review of an arbitration award is thus 'both limited and highly deferential.'" *Id.* (citing *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1288 (9th Cir. 2009)).

80.    Petitioners have the burden to establish "grounds for vacating an arbitration award[.]" *Id.* (citing *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010)). "Section 10 of the FAA permits a court to vacate an award 'where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.'" *Id.* (quoting 9 U.S.C. § 10(a)(3)). "Vacatur is also warranted 'where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'" *Id.* (quoting 9 U.S.C. § 10(a)(4)).

81.    "The Ninth Circuit has held that arbitrators 'exceed their powers' when the award is 'completely irrational' or exhibits a 'manifest disregard of the law.'" *Id.* (citing *Kyocera Corp.*, 341 F.3d at 997.

**II.    Motion to dismiss or for summary judgment.**

82.    According to the Arbitrator's instructions, Airbnb's motion was to be decided under a motion to dismiss or general demurrer standard under Federal Rule 12(b)(6). "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a plaintiff's complaint for

21

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

failing 'to state a claim upon which relief can be granted.'" *Davis v. Nat'l Interstate Ins. Co.*, 686 F. Supp. 3d 984, 989 (E.D. Cal. 2023) (quoting FED. R. CIV. P. 12(b)(6)). The facts alleged in the pleadings "must be enough to raise a right to relief above speculation level[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

83.     Airbnb argued that the motion should be decided under a Rule 56 standard. Under Rule 56 summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact" or that "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "In evaluating the evidence to determine whether there is a genuine issue of fact, the court draws all reasonable inferences supported by the evidence in favor of the non-moving party." *Bax v. Doctors Med. Ctr. of Modesto, Inc.*, 393 F. Supp. 3d 1000, 1008 (E.D. Cal. 2019) (internal quotations omitted).

## THE ORDER SHOULD BE OVERTURNED

### I.     The Release is not valid or enforceable.

84.     Airbnb's primary defense to Petitioners' liability claims rested on whether Neftaly agreed to the Terms of Service and Release, thereby assuming (according to Airbnb) all risks of injury or death associated with The Experience. Petitioners alleged that the evidence gathered in the case contradicted Airbnb's assertion that it could not be liable to Neftaly because of the release.

85.     "A written release may exculpate a tortfeasor from future negligence or misconduct." *Eriksson v. Nunnink*, 233 Cal.App.4th 708, 722, 183 Cal.Rptr.3d 234, 246 (2015). But "[t]o be effective, such a release '*must be clear, unambiguous, and explicit in expressing the intent of the*

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

*subscribing parties.*'" *Id.* (internal citation omitted) (emphasis as in original). It must "clearly, explicitly and comprehensibly set forth to an ordinary person untrained in the law that the intent and effect of the document is to release his claims for his own personal injuries[.]" *Ferrell v. S. Nevada Off-Rd. Enthusiasts, Ltd.*, 147 Cal.App.3d 309, 319, 195 Cal.Rptr. 90, 96 (Ct. App. 1983).

86.     "A release cannot absolve a party from liability for gross negligence." *Jimenez v. 24 Hour Fitness USA, Inc.*, 237 Cal.App.4th 546, 554, 188 Cal.Rptr.3d 228, 235 (2015); *see also City of Santa Barbara v. Superior Court*, 41 Cal.4th 747, 758-60, 161 P.3d 1095, 1102-03 (2007) (agreeing that there can be no release of liability for intentional wrongs or gross negligence).

87.     In California, "[g]ross negligence is defined as either a want of even scant care or an extreme departure from the ordinary standard of conduct." *Epochal Enterprises, Inc. v. LF Encinitas Properties, LLC*, 99 Cal.App.5th 44, 55, 317 Ca.Rptr.3d 573, 582 (2024), as modified on denial of reh'g (Jan. 31, 2024). Importantly, "California does not recognize a distinct common law cause of action for gross negligence apart from negligence." *Id.* (internal citations and quotations omitted). Said differently, "[g]ross negligence is different from ordinary negligence in degree, not in kind." *Id.* at 56. "Where liability attaches only for gross negligence it is for the jury, under proper instructions by the court, to pass upon the question whether such negligence exists." *Id.* (internal citations and quotations omitted).

88.     Based on the evidence, Petitioners' negligence and gross negligence claims should have moved forward to a full hearing. Petitioners raised facts that established their negligence and gross negligence claims, despite the terms of the release. Further still, there were fact issues as to whether Neftaly saw, read, or agreed to the Terms of Service and Release that should have been taken in Petitioners' favor. In short, based on the pleadings and the record, Petitioners had viable negligence and gross negligence claims that should not have been disposed on a Rule 33 motion.

89.     In its motion, Airbnb argued that the Terms of Service and the Release absolved

**Verified Petition to Vacate Arbitration Order**

Airbnb of liability for Neftaly's death. Although the arbitrator agreed, these arguments should have been denied for two reasons.

90.     *First*, the release was inadequate. In their response, Petitioners showed that the release did not "explicitly and comprehensibly set forth to an ordinary person untrained in the law that the intent and effect of the agreement was to release claims for the specific conduct alleged[.]" Ex. 8: Claimants' First Am. Demand for Damages, at ¶ 25. These allegations should have been enough to survive a motion to dismiss or general demurrer.

91.     And under a summary judgment analysis, the evidence raised fact issues that should have precluded dismissal. For example, Petitioners' travel expert explained that "[f]ormal terms, conditions, responsibility statements and disclaimers are a common and crucial part of the travel industry, used to protect the travel seller and the client." Ex. A to Exhibit 6: Price Report, at 21. But here, Airbnb failed to follow industry standards for terms and conditions. *Id.* The disclosure should have included (1) written terms; (2) a hardcopy of the confirmation and acceptance; and (3) documentation showing the date and time of communication to the customer. *Id.*

92.     Ms. Chauvet, Airbnb corporate representative, testified that the policies are linked on the app when the user reaches the "confirm and pay" button. Ex. 4: Chauvet Dep., at 49:21-50:1; 50:17-24. According to Ms. Price, this practice falls short because "Neftaly, Sr., was not required to and did not sign a consent form to acknowledge that there were terms and conditions and that he had read the disclosures Airbnb said they provided." Ex. A to Exhibit 6: Price Report, at 60. Airbnb should have provided a consent form. "The consent form would be a document to inform, educate, and warn Neftaly, Sr. of all known risks and hazards associated with 'The Experience.'" *Id.*

93.     Petitioners' expert Jonathan Hochman noted that "[t]he Airbnb legal terms currently consist of 13 categories of 80 documents" Ex. A to Exhibit 7: Hochman Report, at 18. To read them all would have taken an average adult almost three and a half hours. *Id.* He too agreed with Ms.

24

**Verified Petition to Vacate Arbitration Order**

Price (as did the arbitrator) that consumers like Neftaly are unlikely to read the pages both because of their length, but also because the link appeared during the checkout process. *Id.* at 18-19. Plus, the terms of service were written in complex, difficult language. *Id.* at 20.

94.    After reviewing the evidence, Ms. Price concluded that "Airbnb's user terms and conditions do not clearly, explicitly and comprehensibly convey to an ordinary user that the user is waiving all liability, even for injuries caused by Airbnb's failure to follow its own policies." Ex. A to Exhibit 6: Price Report, at 70.

95.    *Second*, there was no evidence that Neftaly ever saw, read, or agreed to the terms or release. Petitioners put on evidence that neither they "nor decedent Neftaly Torres Sr. was a party to any valid release of claims for the conduct alleged[.]" Ex. 8: Demand, at ¶ 25. Indeed, "[n]o party assented to any agreement that clearly, explicitly and comprehensibly set forth to an ordinary person untrained in the law that the intent and effect of the agreement was to release claims for the specific conduct alleged[.]" *Id.* These allegations on their own were enough under a Rule 8 pleading standard and on a Rule 12(b)(6) motion to dismiss.

96.    The evidence presented to the arbitrator reinforced these allegations. During her deposition, Ms. Chauvet was asked if she could point to a document or other evidence in Airbnb's possession showing that Neftaly reviewed the policies. *See* Ex. 4: Chauvet Dep., at 49:21-50:1; 50:17-24. She couldn't. And not one witness testified that Neftaly saw, read, or agreed to the TOC and Release. *See* Ex. 4: Chauvet Dep., at 53:23-54:8. Thus, the release should have been declared not binding.

97.    Petitioners also alleged facts establishing viable negligence claims that precluded dismissal. Those facts included allegations that Airbnb was grossly negligent. For example, Petitioners alleged that:

- Dyon was Airbnb's agent acting on behalf of Airbnb in taking

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

Neftaly on The Experience;

- Airbnb knew that Dyon was encouraging paying Airbnb customers to jump off the cliff into the dangerous waters below based on the customer reviews; Airbnb took no action to prevent this dangerous activity;

- Airbnb failed to ensure that Experience hosts like Dyon followed relevant and applicable guidelines and regulations at Conchi Beach;

- Airbnb failed to monitor its experiences for dangerous activities and to hire, manage, train, and supervise competent agents;

- Airbnb disregarded Neftaly's safety and its conduct was an extreme departure from the ordinary standard of conduct; and it failed to exercise even scant care to ensure Neftaly's safety.

Ex. 8: Demand, at ¶¶ 19-22.

98.    And the record showed ample evidence of gross negligence—evidence that the arbitrator should have taken in Petitioners' favor. For starters, "[t]here is no indication that Airbnb monitored, investigated or communicated concerns from guest reviews to Neftaly, Sr." Ex. A to Exhibit 6: Price Report, at 63. This alone shows that "Airbnb's conduct was an extreme departure from the ordinary standard of care in the travel industry." *Id.* at 36. To illustrate:

- "Airbnb went beyond breaching their duty to warn Neftaly, Sr., of the dangers associated with 'The Experience,' and to act in good faith, they failed to provide relevant destination and safety information that Neftaly, Sr., needed to make an informed decision." *Id.* at 36-37.

  o "Airbnb violated their community standards." *Id.*

  o "Airbnb ignored their special review policies." *Id.*

  o "Airbnb advertised that safety is their highest priority, but repeatedly overlooked the safety measures they designed, resulting in Neftaly Sr.'s death." *Id.*

  o "Airbnb knowingly allowed cliff jumping, a prohibited activity, defined by Airbnb's Quality Training Review Guidelines as death defying." *Id.*

  o "Airbnb failed to investigate or act on guest reviews and comments that repeatedly discussed cliff jumping as part of 'The Experience.'" *Id.*

26

Verified Petition to Vacate Arbitration Order

- "Airbnb had full knowledge of repeatedly reported cliff jumping and cliff diving from guest reviews, and not only did they ignore guest reviews, Airbnb endorsed and accepted this risky experience." *Id.* at 62.

99.    Airbnb was grossly negligent by "allowing 'The Experience' to go forward despite receiving multiple reviews prior to the incident of cliff jumping or cliff diving was an extreme departure from the ordinary standard of conduct for a travel seller in Airbnb's position." *Id.* at 38. Airbnb knew the danger, but it "continued to allow the cliff jumping and cliff diving to occur on 'The Experience' despite receiving actual and direct notice of these violations." *Id.*; *see also Persian Gulf Inc. v. BP W. Coast Products LLC*, 632 F. Supp. 3d 1108, 1127-28 (S.D. Cal. 2022), appeal dismissed sub nom. *Persian Gulf, Inc. v. Chevron U.S.A. Inc.*, No. 22-56010, 2023 WL 566364 (9th Cir. Jan. 11, 2023) (documents that are available to the company are within the company's knowledge). This behavior was "reckless" and subjected Neftaly to "an extreme degree of risk that he would not have been subject to absent Airbnb's conduct." *Id.*

* * *

100.    In sum, the arbitrator erred with he declared the Release valid. And importantly, Airbnb did not cite a single case analogous to this one that supported its Rule 33 arguments or justified the arbitrator's decision.[3]

## II.    The arbitrator erred when he found that the Assumption of Risk Doctrine barred Petitioners' negligence claims.

101.    The affirmative defense of primary assumption of the risk applies only if Airbnb "lacked a duty to protect [Neftaly] from a particular risk of harm." *Taylor v. United States*, 350 Fed. Appx. 129, 131 (9th Cir. 2009). "The doctrine turns on 'the nature of the activity or sport in which the defendant is engaged' and 'the relationship of the defendant and the plaintiff to that activity or

---

[3] Airbnb does not cite a single case that is analogous to this one. Exhibit 9 is a case table discussing the most relevant, albeit distinguishable, cases.

Verified Petition to Vacate Arbitration Order

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

sport.'" *Id.* (internal citations omitted).

102.    Here, the arbitrator erred when he determined that Airbnb did not owe a duty to Neftaly based on a special relationship. Petitioners made the following allegations:

- Neftaly and Van arranged their entire trip through Airbnb.

- The Experience was advertised to Neftaly and Van via the platform.

- Airbnb profited directly from The Experience.

- Airbnb was responsible for the creation and development of the experience.

- Airbnb knew that Dyon was encouraging paying Airbnb customers to jump off the cliff into the dangerous waters below.

Ex. 8: Demand, at ¶¶ 6, 17, 19.

103.    Further, the evidence in the case—that included expert testimony—should have been more than enough to at least raise a fact issue on Airbnb's primary assumption of risk defense. In her report, travel expert Diana Price explains that: "Travel industry standards exist to promote integrity and trust within the travel industry, protect the traveling public, and represent the interests of sellers of travel." Ex. A to Exhibit 6: Price Report, at 28.

104.    "Even if Airbnb says that guests assume the entire risk arising out of guest access to and use of the Airbnb Platform, there is no evidence that Neftaly, Sr., was aware that Airbnb was ignoring their own safety policies, nor did Neftaly, Sr., sign a written waiver or consent form agreement to the prohibitive, death defying activities included in 'The Experience.'" *Id.* at 72-73.

105.    To conclude on this point, based on the pleadings and the evidence, the arbitrator should not have dismissed Petitioners' causes of action based on the assumption of risk doctrine.

**III.    As a travel seller, Airbnb owed Neftaly a duty of reasonable care.**

106.    The arbitrator also erred when he determined that Airbnb did not owe Petitioners (and Neftaly) a duty of care.

107.    In California, "[g]enerally speaking, all persons have a duty to take reasonable care

28

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

in their activities to avoid causing injury[.]" *Brown v. USA Taekwondo*, 11 Cal.5th 204, 209, 483 P.3d 159, 161 (2021). That duty extends to defendants like Airbnb where there is a "special relationship between the parties . . . giving rise to an affirmative duty to protect." *Id.*

108.    "[T]ravel sellers have a duty to disclose and warn out-of-town customers of relevant information and any risk of foreseeable dangers and harm associated with a particular destination, which the travel seller knew or should have known about." Ex. A to Exhibit 6: Price Report, at 20. "This duty to disclose has been the industry standard for years[.]" *Id.*

### A. Airbnb created the dangerous condition.

109.    "When analyzing duty in the context of third party acts, courts distinguish between 'misfeasance' and 'nonfeasance.'" *Melton v. Boustred*, 183 Cal.App.4th 521, 531, 107 Cal.Rptr.3d 481, 490 (2010). "Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk." *Id.* (internal citations omitted). Duty arises where the defendant's acts make the plaintiff's position worse by creating a foreseeable risk of harm from the third person. *Id.* When that occurs, "the question of duty is governed by the standards of ordinary care." *Id.* (internal citations and quotations omitted).

110.    The evidence here was clear: Airbnb's actions created the dangerous condition (an experience that violated Airbnb policy) and put Neftaly in a worse position by failing to warn him about the hazards.

111.    "Airbnb did not warn or tell Neftaly Sr., that cliff diving was a prohibited activity or how dangerous it was[]" despite having multiple data points that Dyon was violating the terms of service and Airbnb policy. Ex. A to Exhibit 6: Price Report, at 34. Airbnb's representatives admitted repeatedly that cliff jumping, or cliff diving is a prohibited activity and a direct breach of Airbnb policies. Ex. 4: Chauvet Dep., at 36:17-37:3; 37:22-25; 39:5-11. Airbnb was grossly negligent by "allowing 'The Experience' to go forward despite receiving multiple reviews prior to the incident

29

**Verified Petition to Vacate Arbitration Order**

of cliff jumping or cliff diving was an extreme departure from the ordinary standard of conduct for a travel seller in Airbnb's position." Ex. A to Exhibit 6: Price Report, at 38. Airbnb knew that one of its hosts was encouraging and engaging in prohibited activities on The Experience but failed to warn Neftaly. Van testified that if she and Neftaly had been properly warned, they would not have gone on The Experience. Ex. 1: Tseng Dep., at 60:2-21; 61:7-16. Airbnb's failures made The Experience more dangerous and ultimately led to Neftaly's death.

### B. Airbnb had a legal relationship with both Neftaly and Dyon.

112.    In California, sometimes a defendant has "an affirmative duty to protect the plaintiff from harm at the hands of a third party, even though the risk of harm is not of the defendant's own making." *Doe v. Uber Techs., Inc.*, No. 19-CV-03310-JSC, 2022 WL 4281363, at *2 (N.D. Cal. Sept. 15, 2022) (internal quotations and citations omitted). When there is either (1) a special relationship; or (2) misfeasance (the defendant has created the risk), the parties "are in a special relationship" under the law. *Id.* Here, Petitioners made alleged and offered evidence that raised issues of fact that establishes a "special relationships" between both Airbnb and Neftaly and Airbnb and Dyon.

113.    First, Petitioners pointed out that Airbnb implements "public-facing policies and procedures" directed to users like Neftaly. Ex. 8: Demand, at ¶ 17. Airbnb specifically targeted Neftaly through its platform where Neftaly arranged his entire trip. *Id.* at ¶ 6.

114.    After reviewing the evidence, travel expert Diana Price explained that through its platform, "Airbnb's relationship is similar to that of an innkeeper, hotel, or other travel entity who is providing travel services to a paying guest or patron." Ex. A to Exhibit 6: Price Report, at 46.

115.    In short, there was evidence of a "special relationship" between Neftaly and Airbnb.

116.    The same can be said of Dyon and Airbnb. In California, "the fact that one is performing work and labor for another is prima facie evidence of employment and such person is

30

**Verified Petition to Vacate Arbitration Order**

presumed to be a servant in the absence of evidence to the contrary." *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1138 (N.D. Cal. 2015) (internal citations and quotation marks omitted). The right to control the agent's work is the "most significant consideration" in the analysis. *Id.* "[A]n employer's 'right to discharge at will, without cause' is 'strong evidence in support of an employment relationship.'" *Id.* at 1139 (quoting *Borello & Sons, Inc. v. Dep't of Indus. Relations (Borello)*, 48 Cal.3d 341, 350, 256 Cal.Rptr. 543, 769 P.2d 399 (1989)).

117.    Petitioners made allegations that "[a]s an Airbnb-Experience Host, Dyon was an agent of Airbnb, Inc." Ex. 8: Demand, at ¶ 14. "All Experience Hosts were subject to a background check" and "Airbnb also exerted considerable control over what Experiences could be listed and what activities could comprise an Airbnb Experience." *Id.* at ¶ 17. Additionally, "Airbnb profited directly from every Experience" and Airbnb "was directly and legally responsible for affirmatively increasing the risk of harm to" Neftaly through its relationship with Dyon. *Id.*

118.    The evidence confirmed that Airbnb exercised control over Dyon's work by retaining certain rights. To be sure, "Airbnb had a special relationship with Dyon" because it "could directly control Dyon's conduct through the vetting process of 'The Experience', by monitoring Dyon's conduct on 'The Experience' through reviews, and has the ultimate approval of whether 'The Experience' would be approved, marketed, or offered through Airbnb's platform to begin with." Ex. A to Exhibit 6: Price Report, at 46.

119.    Again, Airbnb's involvement created a special relationship between the company and Dyon. Airbnb is not simply a platform provider or a host website. In his order, the arbitrator focused on Section 230 of the Communications Decency Act (47 U.S.C. 230(c)(1)), and decided that Section 230 required dismissal of Petitioners' claims. But the law in California does not support that decision.

120.    True, "Section 230 'immunizes providers of interactive computer services against

31

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

liability arising from content created by third parties.'" *Liapes*, 95 Cal.App.5th at 928. But "[t]he prototypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *Id.* (internal quotations omitted). In short, "an interactive computer service provider only has immunity if it is *not* also the information content provider—that is, someone 'responsible, in whole or in part, for the creation or development' of the content at issue." *Id.* Said differently, content providers like Airbnb do not enjoy blanket immunity protections as the arbitrator suggests. *Id.*

121.    Here, Airbnb is actively involved in creating, advertising, and facilitating the experiences. And it shares in the profits. The arbitrator erred by applying Section 230 to Petitioners' claims. Airbnb owed a duty to Neftaly to exercise reasonable care. The claims should not have been dismissed.

**IV.    Airbnb failed to enforce its policies against Dyon, Airbnb's agent.**

122.    "California recognizes torts for an employer's negligence in hiring, retaining, and supervising an employee who is incompetent or unfit." *F.D.I.C. v. Cashman*, No. C 11-03334 SI, 2011 WL 6002611, at *4 (N.D. Cal. Nov. 30, 2011) (citing *Delfino v. Agilent Techs., Inc.*, 145 Cal.App.4th 790, 52 Cal.Rptr.3d 376, 397 (Ct. App. 2006)). "Liability for negligence in selecting, training, retaining, supervising, or otherwise controlling the agent 'is one of direct liability for negligence, not vicarious liability.'" *Ochoa v. City of Hayward*, No. C-14-02385 DMR, 2014 WL 4088203, at * 5 (N.D. Cal. Aug. 19, 2014) (quoting *Phillips v. TLC Plumbing, Inc.*, 172 Cal.App.4th 1133, 1139 (2009)). "California follows the rule set forth in the Restatement (Second) of Agency Section 213, which provides in part: 'A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligence or reckless[.]'" *Cashman*, 2011 WL 6002611, at *4.

123.    In their response to Airbnb's Rule 33 motion, Petitioners offered evidence that was

**Verified Petition to Vacate Arbitration Order**

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

more than adequate to show that Airbnb was negligent when it vetted Dyon's proposed listing, allowed him to advertise on the platform, knew or should have known that Dyon was violating company policies by taking guests cliff diving, but failed to suspend Dyon or initiate other enforcement actions.

124.    Petitioners alleged that "Airbnb failed to investigate whether Dyon's 'Morning hike with a nature enthusiast' was safe and followed the laws and regulations prohibiting cliff diving at Conchi Beach." Ex. 8: Demand, at ¶ 31. "Airbnb failed to supervise Dyon to ensure he was not taking Airbnb Experience customers on dangerous cliff-diving excursions at Conchi Beach." *Id.* These failures "increased the risk" to Neftaly and "were an extreme departure from the ordinary standard of conduct." *Id.* at ¶¶ 32, 34.

125.    During the vetting process, Airbnb did not ensure that The Experience was properly reviewed and void of certain violations of Airbnb's policies. Ex. 5: Panda Dep., at 46:6-10. For example, the listing mentioned swimming—an activity prohibited in the Park. Even worse, Airbnb had actual or constructive knowledge that Dyon was violating Airbnb policy by taking guests cliff jumping. This should have elicited immediate action by Airbnb.

126.    Ms. Chauvet explained that violations of Airbnb policy by hosts can trigger an enforcement action. Ex. 4: Chauvet Dep., at 65:6-11. And violations of Airbnb's terms of service are grounds for suspension. *Id.* at 79:14-24. "Dyon did not hide the fact that cliff jumping, diving and swimming was happening." Ex. A to Exhibit 6: Price Report, at 55. Indeed, "Airbnb knew that cliff jumping was popular and included in 'The Experience[] . . . [because] Dyon received many excellent reviews from guests, highly recommending 'The Experience.'" *Id.* Despite knowing that Dyon was encouraging guests to participate in prohibited activities, Airbnb did not shut down the experience or start any other enforcement actions. *Id.* By choosing not to monitor and supervise Dyon by exercising its authority to suspend Dyon or otherwise enforce its policies, Airbnb was

33

**Verified Petition to Vacate Arbitration Order**

liable to Neftaly for negligent hiring, monitoring, and supervision.

## CONCLUSION

127.    The Court should grant this Petition, vacate the arbitrator's order, and remand the case for trial.

Dated:   February 10, 2025                    **ARNOLD & ITKIN LLP**

                                              */s/ Roland Christensen*
                              By:   _____
                                              Roland Christensen
                                              Alec Paradowski

Arnold & Itkin LLP
6009 Memorial Drvie
Houston, Texas 77007

34

**Verified Petition to Vacate Arbitration Order**